May it please the court, Ashfaq Chowdhury on behalf of appellant Christopher Roland Bradley. Your honors, I would like to reserve two minutes. All right, please watch your clock. Thank you, your honor. This appeal presents a sentencing guidelines issue. As to Judge Noonan won't be able to hear you if you don't speak loud enough to be heard up in San Francisco. Thank you. Long way, your honor. I'll try. Thank you, Judge Fischer. The question here is how to apply the relevant conduct guideline. And I think what's clear from here is that the relevant conduct guideline is somewhat counterintuitive to those of us familiar with the general conspiracy standard, Pinkerton conspiracy, those who enter into a conspiracy generally liable for the foreseeable acts of everyone else in the conspiracy. But 1B1.3 as this court has noted in its application notes, as this court has noted in Garcia Sanchez, other cases, makes clear that relevant conduct in a case is not necessarily the same as conspiracy liability. The application note 2 says jointly undertaken criminal activity is not necessarily the same as the scope of the entire conspiracy. And hence, relevant conduct is not necessarily the same for every participant. Now, I think it's indicative of what happened here to look at the probation officer's response to trial counsel's objections to the calculation guidelines. That's that ER addendum 33 and 34. And in the response, the probation officer says, in the case of a jointly undertaken conspiracy, Section 1B1.3 provides at the base offense level, specific offense characteristics, and Chapter 3 enhancements are determined on the basis of all reasonably foreseeable acts and omissions of others committed in furtherance of the jointly undertaken criminal activity. The defendant was convicted of a conspiracy to distribute and to possess with intent to distribute oxycodone. As part of the scheme, his co-defendants mailed him oxycodone, and the defendant mailed his co-defendants the drug proceeds. Accordingly, the fact that his co-defendants possessed oxycodone at their residence during the time frame of the incident offense appears reasonably foreseeable to the defendant under a preponderance of evidence standard. Now, that's basically a conspiracy, general conspiracy standard that the probation officer is applying there. What the probation officer did not do is what this court did in Garcia Sanchez, which, as the court is aware, involved three employees who were employed by one drug supplier who were all working out of the same trailer. And the question that Garcia Sanchez went to was, while those three employers are in the trailer, can each defendant be held responsible for all of the drugs that were sold out of the trailer? And this court made very clear, no, you have to look at the individual scope that each employee had. And that's exactly what we're saying here. This is a hub-and-spoke conspiracy. That's not my view of it. That's the view set out in the indictment at ER 40 and 41. The indictment describes the L.A. residents of Banks and Arnold as the stash house. The indictment says that Banks and Arnold would mail drugs to other downstream sellers, including Defendant Bradley and others. We know from the PSR that there were others. We know from the PSR that Charles Gary received drugs in the mail from the stash house. Now, there's some issues about Mr. Gary's statements, but this is what we know. In the controlled delivery, he received 900 pills in the seizure that we have. There was then a search of his house. And inside the house, they found another package with 1,100 pills. Now, with the one seizure of pills that we have to This is precisely why we have to look at the relevant scope of each Defendant's conspiracy, what the agreed joint criminal activity they agreed to join. Are you saying the district court did not examine the scope of the conspiracy that Mr. Bradley joined? Yes, Your Honor. I would say that he did not do the two-step analysis in trying to determine what was the scope of Mr. Bradley's specific conspiracy. And that's important because here, we know that there's a stash house with 115 grams of oxycodone that they Wasn't there also other drugs found there? Other drugs and guns and things? That is true, Your Honor. There were other drugs, there were other prescription drugs, and there was a gun. And the district court did not attribute the gun to him? That's correct, Your Honor. Because he didn't believe it would fall within the scope of what he would have been involved in or could foresee? Yes, Your Honor. The district court said, this is at ER 14 through 20, the district court said it's not clear to me that someone in Anchorage would know what was going on down in L.A. so far away, thousands of miles away. The court looked at the various mailings, about 30-some-odd mailings? Yes, thank you, Your Honor. And that's a crucial point. It's crucial? Why? The court thought it was crucial in calculating what would be reasonably foreseeable and also as to the scope of the conspiracy. Yes, Your Honor. My recollection is that Gary, who got a delivery in Kent, attributed it to Bradley, but Bradley had talked to him and said, I've been convicted of a DUI, so I don't want anything coming to me directly up here in Alaska. Yes, Your Honor. And that's at ER Addendum 7, paragraphs 13 and 14 of the PSR. It was actually, according to Mr. Gary, it was Mr. Bradley's girlfriend who contacted him to say, hold these pills. Mr. Gary did not say anything about the other 11 other pills? The court didn't attribute the Gary pills to Mr. Bradley. That's true. The court said that he had some concerns about the reliability of the stipulation. And you're saying he didn't do any analysis of the scope of the conspiracy? Your Honor, I'm not saying that the court didn't do any analysis of the conspiracy, but what it appears that the court did was take the 115 grams that were found in the L.A. Stash House and use those as a rough proxy for what it saw as activity in the mailings in the PSR. Now, the important point on this is the burden of proof, I think. The court announced that it was using clear and convincing, but regardless of the standard of proof, the government took the position in its position paper at least three times at the sentencing hearing between ER 14 and 20, this is on ER 14 and 16, to say we are solely relying on the seized amounts to establish the conspiracy and the relevant quantity. The mailings are submitted only to show the length and duration of the conspiracy. Now, that's important because in this appeal, the government argues that, well, even if the court did not apply the 1B1.3 analysis, it could have used the multiplier method, citing to Culp's and Scheel. Now, as the court's aware, in Culp's and Scheel, there was a very detailed multiplier formula set up in terms of amount of drugs reasonably estimated, amount of traffic, et cetera, amount of time. If we were to agree with you, and I'm glad you raised Culp's well-written opinion, it did occur to me as I was reading, and I forget where it got called to mind, I didn't just leap out at me. I don't want to go that far. But there were, what, 13 grams ultimately attributed to Bradley? Yes, Your Honor. If there was an extrapolation from the 13 grams and the number of letters that were sent, what would the calculus be under a Culp's approach? Well, Your Honor, I think here what we have, as trial counsel repeatedly stated in his objections, is a failure of proof because we're looking at mailings, and there are obviously mailings going to other individuals in Oregon, in Washington, we don't know where else, so we don't know what we're comparing the number of mailings to. Well, I mean, you take the amounts that were found that were known. I think that's what Mr. Bradley was arguing for, and the court was saying, no, I'm not going to go for zero on attribution. Yes, Your Honor. If you prevail, what would be the remedy? Well, Your Honor, I think the... Well, Your Honor, I think that the government took its position. I would say that if they were to argue differently now that a multiplier approach is applicable here, that would be completely... Well, I think they did raise it in their brief as a footnote, perhaps, or whatever, saying it's an alternative. Well, Your Honor, that... You're saying they waived that. I am saying they waived that, and actually this came up a number of times during the hearing. At ER 14, trial counsel for the government stated at the sentencing hearing, the calculation that the pre-sentence report and the government used is based only on the amount of drugs that were actually found in the case, ER 16. Then your drug calculation, this is the court, does not consider the amounts that may have been sent back and forth through just the labels that you found. Trial counsel for the government, that's correct, Your Honor. Trial counsel for the government continues. We've submitted the labels merely to show the extent of time over which there were packages going back and forth. But the drug calculations are based on the amounts that were actually found. And I think it's a basic principle that this is the government's burden. The government repeatedly, in response to the trial court's questions, said we are not relying on these mailings. So I think it's entirely inconsistent, and I think the government's waived it to say now, well, the multiplier method was out there. The government told the trial court, advised the trial court a number of times. It was not the multiplier method it was relying on. So I think under 1B1.3 Garcia-Sanchez, as a first step, the 1B1.3 analysis requires some type of apportionment. And we know, in looking at the illustrations, application note 2C4, which is the conspiracy to distribute child pornography, which also describes a hub-and-spoke conspiracy, we know there the supplier is responsible for all the amounts of contraband he's sending out. The downstream spokes, the retail-level sellers, are responsible for the amount that they purchased, that they were involved with. All right, counsel. You're over your time limit. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Lane Dilg for the United States. The defendant in this case was charged with conspiring with his co-defendants to distribute and possess with intent to distribute oxycodone and oxymorphone. He pled guilty only to the conspiracy with respect to oxycodone. At sentencing, the district court made a careful, individualized determination as to the amounts of oxycodone for which defendants should be personally held responsible. Judge Pragerson applied the correct legal standard. At ER 12, he states clearly, is it reasonably foreseeable for the defendant as to this particular conspiracy? He's looking individually at this defendant and his particular conspiracy with the co-defendants. He then carefully applied that standard to the facts of this case. He did not hold the defendant responsible for any of the oxymorphone or other drugs found at the co-defendant's house, for the firearms found at the co-defendant's house, for the oxycodone sent to or possessed by Gary, even though multiple factors linked those drugs to the defendant. He did not hold defendant responsible for the $10,000 in drug proceeds the defendant had admitted to sending to his co-defendants, and he did not attribute any amount for the packages going back and forth between defendant and his co-defendants between June 2010 and July 2011. As defense counsel stated, those packages were looked at to determine the scope of the conspiracy overall, not the drug quantity amount specifically. I'm a little confused about what he did. If you look at ER 20 and what he says, he seems to be making an estimate. I'm not sure what it's entirely based on, but he says he thinks that 30 is conservative, so he finds the base offense levels 30. But he says it certainly seems to me that there's no rationale explanation for the 40 or 60 mailings, other than they were drug proceeds or cash from drug proceeds, but he doesn't tie them to the defendant. And then you look at what the judge says versus the pre-sentencing report, paragraph 27. There the probation officer reaches the level 30 based on only grams found at the Gramercy address on May 7, and the three grams mailed by Arnold on August 8. So he's being held accountable for the entire amount of oxycodone at the address. That's correct. So why is Judge Prayerson talking about it like it's an estimate? I believe you're on. I mean, the probation officer clearly held him accountable for all of it. That's correct, Your Honor. The judge and the probation officer held the defendant responsible for all of the oxycodone found in the co-defendant's house on that one occasion. I believe the reason the judge is talking about the packages and also talking about an estimate is because he's looking at the scope of the entire conspiracy. Unfortunately, this is not a wire case or a case where there is significant evidence showing each individual transaction. What the judge has is this evidence that points to the length of the conspiracy. He has points in time. He has the December 2010 mailing of $10,000 in drug proceeds, and he has the three grams received by Bradley almost a year later. So he has these points in time where he has specific amounts going back and forth, and then he has this one seizure at the stash house. And what he's saying is, based on the totality of the circumstances and everything I see here, the 115.78 grams found at the stash house is a reasonable amount to attribute to this defendant. And in fact, he says, it likely understates the amount of drugs distributed by this defendant over time. Well, do you agree that the government had the burden by clearing convincing proof to prove the amount? Your Honor, under the court's precedence, the government believes it had the burden by a preponderance of the evidence, but the district court did make the finding by clearing convincing. Is there any, do we take anything from the fact that he sentenced at the low end of the guidelines? Your Honor, the district court has an obligation to get the sentencing guidelines correct. So it certainly, it does not make it harmless. I'd like to speak to harmlessness in one second, but it does not make it harmless. However, I do think it's one more indication that Judge Pragerson is looking at this defendant very individually and very carefully. I mean, he, this is not a judge who is reaching out to try to find some astronomical amount to hold the defendant accountable for. What he's doing is properly applying the standard, reaching an amount that he believes is conservative for this individual defendant's responsibility over the course of his particular conspiracy undertaken with the co-defendants, and then he does apply a below-guidelines sentence. Also, with respect to harmlessness, and I don't want to get bogged down in this, but the government had raised culps in other cases with the multiplier effect. I just want to be clear, the government's argument there,  the government's argument there is that if this Court were to send this case back to the district court for resentencing, the multiplier method would be an option available to the government. That would be a way we could prove up the case. And what we've done in our brief is show that that would end us in the exact same place under the guidelines. And for that reason, we believe that any error in calculating the guidelines amount was harmless. So we're not saying that the judge actually applied that method here, only that it's harmless. Counsel says it was waived because you disavowed, the government disavowed using the mailings as any evidence of quantity. I don't believe that, Your Honor. I believe that we had the option of presenting one alternative should the case be remanded. The government would believe it would have that alternative available to it. The government here put forward what it believed was a conservative estimate. The probation officer also stated at ER Addendum 28 that it believed it was a conservative and an underestimate for this particular defendant. And the district judge also stated that at ER 19 through 20. I guess in reading the application note, it seems to make pretty clear that in order to determine the defendant's accountability, the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake. And then, I don't see how you could possibly do it any other way. Anyway, you have to determine the scope before you can see, determine whether what was there was in furtherance of that scope. Right? Do you agree? Yes, Your Honor. I do. And do you think Judge Pragerson did that here? I do, Your Honor. I believe he did that implicitly. I believe the PSR did that by going step-by-step. I believe he analyzed each item on an item-by-item basis after determining the scope overall. But even the indictment says that there were others involved. So since the indictment charged others, the government seemed to be aware that there were other people who were also distributing the oxycodone, right? Yes, Your Honor. If I may speak to the first question just briefly and then answer that question. On the need for an explicit two-step analysis, the government does believe that the defendant did not argue that below, and therefore it would be reviewed under plain error. Right. With respect to the multiple distributors, this is a difficult case on that ground. These mailings are going back and forth with fake names. The defendant here used at least three fake names. There's oxycodone and oxymorphone involved. For these other potential distributors, it's unknown whether they would be distributing oxycodone or oxymorphone. The government would also point out the defendant did not make that argument below. So there was no argument below that the stash house should be divided, that the sentencing guidelines examples required that, or that the facts of this case required that. The defendant argued below that he should be held responsible for none of the amounts in that stash house. And the district judge disagreed with that after reviewing everything very carefully. The government would contend that this is a case where the district judge was   house. Now, if this is the amount that was seized, is it reasonably foreseeable to this defendant in the scope of his conspiracy? If there were others involved, how could all of that be attributed to him? Well, Your Honor, I think if we had a case that had, a case that was cleaner as they are in the sentencing guidelines. So the defense points to two application notes where there are multiple known distributors. The amounts that they are distributing are well known. And the full amounts of the conspiracy. So particularly if you look at Garcia Sanchez, that may be the best starting point. If you look at Garcia Sanchez, the court in that case held the defendant responsible for all of the drugs that the entire conspiracy had distributed over time. So that would be as if Judge Pragerson had looked at June 2010 to June 2011 and estimated the entire amount that Banks and Arnold distributed over that entire period of time and then attributed all of that to this defendant. Judge Pragerson didn't do that here. He found one seizure in the stash house that the drug quantity was known, and he looked at was that quantity reasonably foreseeable to this defendant in the course of his conspiracy to distribute oxycodone. Again, he then found that that was a reasonable amount and reasonably foreseeable to this particular defendant. Even if that defendant wouldn't necessarily have been distributing all of that amount? I believe that's correct, Your Honor. I mean, I think that is what the district judge did. I think he believed that that number was a conservative estimate for this defendant. And so absent the objections below by defense counsel that it should have been done in a different way, I believe he found that an appropriate way to do this. Well, the defendant did object to a base offense level of 30. He did. And the government's not arguing waiver. The government would actually argue that if you're looking at that point particularly, you would be applying essentially an abuse of discretion or a clear error standard of review to what the district court is doing there. And the government would argue that based on the facts and the arguments made before the district judge, Judge Pragerson neither abused his discretion in attributing that full stash house to that full amount of oxycodone only, not the guns, not the other drugs, to this defendant, nor did he commit clear error in believing that that was a reasonable attribute. All right. Thank you, counsel. Thank you. You went over your time. I'll give you one minute. Thank you, Your Honor. First, as to the plain error, I would just note, as this Court has said a number of times in Flores, Culp's, Scheel, from Culp's, for example, whether the method adopted by the district court to approximate the relevant quantity of drugs is proper under the guidelines is reviewed de novo. And that's really what we're talking about here, whether the method applied by the trial court to approximate the drugs attributable to Mr. Bradley is proper, whether that was a proper method. I think it's clear that from what we see that what happened here was kind of an estimate, a multiplier method without really going through the steps of the multiplier method. Aren't you concerned that if we send this back, he might sentence your client to a higher amount? Well, Your Honor, as I said before, it is our position that the government has waived the ability to rely on the multiplier method. It took that position very clearly. That's in the transcript. And I would add this as to the mailings. Trial counsel also, defense trial counsel also objected to the mailings being attributed to Mr. Bradley. If we look at that, if you look at the sentencing position, it's just a number of mailings attached as Exhibit A. There's no handwriting analysis. There's a handwriting analysis suggested in a footnote that the defendant uses a capital A sometimes. There are different addresses, different locations. And we objected to that, saying we don't even know that these are attributable. And I think that's part of the reason that the government did not rely on those possibly. The PSR did not rely on them because it was not reliable enough. And if we looked at the 28J letter that we submitted in Mr. Banks' sentencing, the government also did not rely on the multiplier method there, too, either, possibly because the evidence it had was not that reliable. There was no expert tying this to our defendant. So that's, again, an issue of the burden of proof. The government had that burden of proof, and they made their position very clear in terms of what they were doing. So I don't think that the approach that the trial court took can stand here. It basically made an estimate, as Judge Wardlaw pointed out, without really going through the steps that this court has gone over a number of times in Kolb's, Scheel, other cases, which require very specific evidence. Now, why we're relying on the materials that were actually seized? Because we know about those materials, and that's something concrete, as opposed to what appears to be a failure of proof as to the other amounts. All right. Thank you, counsel. Thank you very much. Thank you, Your Honor. U.S. v. Bradley is submitted.
judges: Noonan, Wardlaw, Fisher